**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JASON FLOWERS,              )       CASE NO. 4:14-CV-00073
                              )
          Plaintiff,      )       JUDGE GAUGHAN
                              )
         v.             )       MAGISTRATE JUDGE
                              )       VECCHIARELLI
CAROLYN W. COLVIN,      )
     Acting Commissioner    )
     of Social Security,      )
                              )       **REPORT AND RECOMMENDATION**
         Defendant.

    Plaintiff, Jason Flowers ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

    On August 19, 2011, Plaintiff filed his applications for POD, DIB, and SSI,

alleging a disability onset date of August 4, 2011.  (Transcript ("Tr.") 14.)  The

application was denied initially and upon reconsideration, and Plaintiff requested a

hearing before an administrative law judge ("ALJ").  (*Id.*)  On May 29, 2013, an ALJ held

Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by

counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.
(*Id.*)  On September 18, 2013, the ALJ found Plaintiff not disabled.  (Tr. 11.)  On
November 22, 2013, the Appeals Council declined to review the ALJ's decision, and the
ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On January 10,
2014, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc.
No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 13, 14.)

Plaintiff asserts the following assignment of error: The ALJ's residual functional
capacity (RFC) determination is not supported by substantial evidence, because the
ALJ failed to account for all of the medical limitations assessed by Dr. Konienczny and
Dr. Gruenfeld.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in August 1982 and was 28-years-old on the alleged disability
onset date.  (Tr. 25.)  He had at least a high school education and was able to
communicate in English.  (*Id.*)  He had past relevant work as a telemarketer/solicitor.
(*Id.*)

### B.    Medical Evidence

#### 1.    Medical Reports

Plaintiff was taken to the emergency room in August 2011 for treatment of
gunshot wounds to his face and right thigh following a robbery.  (Tr. 278.)  He was
discharged from the hospital in good condition on September 12, 2011.  (Tr. 310.)

Plaintiff began treatment with Valley Counseling Services in September 2011.

2

(Tr. 425-440.)  He reported to Bette Nisbett, a licensed social worker, that he was nervous, anxious, and hypervigilant since being the victim of a robbery, and that he suffered panic attacks and experienced flash backs of the incident.  (Tr. 433.)  He further reported that he was afraid to leave his house, overly sensitive to sounds, and obsessive about locking doors.  (*Id.*)  At assessments on September 15th and 23rd, Ms. Nisbett opined that Plaintiff had the following issues: anger, psychosis, difficulty sleeping, mild auditory hallucinations, suicidal thoughts, and problems with attention and concentration.  (Tr. 295-306.)  Plaintiff was able to identify family and friends with whom he had good relationships and indicated that he enjoyed playing video games and watching movies.  (Tr. 426-427.)  He stated that he would like to return to work eventually but had problems being around others.  (Tr. 428.)  Ms. Nesbitt diagnosed Plaintiff with post-traumatic stress disorder (PTSD) and depressive disorder not otherwise specified (NOS), and assigned him a Global Assessment of Functioning (GAF) score of 51.[1]

On September 23, 2011, Plaintiff saw Ronald Yendrek, D.O., for an initial psychiatric evaluation.  (Tr. 447-451.)  At the time of the assessment, Plaintiff was well-groomed; his demeanor was normal and appropriate; his speech was clear and normal; he did not exhibit aggressive behaviors, delusions, or hallucinations; his thought process was logical; his mood was moderately depressed; and his behavior was

---

[1]     The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

cooperative.  (Tr. 448-450.)  Dr. Yendrek diagnosed PTSD and assigned a GAF score of 45.[2]  (Tr. 451.)  Plaintiff was prescribed Paxil.  (Tr. 419.)

At a December 2011 visit with Dr. Yendrek, Plaintiff reported that he had stopped taking his medication two months earlier.  (Tr. 445-446.)  Plaintiff stated that his anxiety and depression levels were a six out of ten and that he was "not up to much" and mostly stayed at home.  (Tr. 445.)  He was not acutely suicidal, homicidal, or psychotic. (*Id.*)  Dr. Yendrek increased Plaintiff's dose of Paxil from 20 mg to 40 mg.  (Tr. 452.)  In March 2012, Dr. Yendrek noted that Plaintiff was back on his medication.  (Tr. 443-444.)  Plaintiff reported that he was sleeping better and had gotten back in touch with his daughter.  (Tr. 443.)  Plaintiff was not acutely suicidal, homicidal, or psychotic at that time.  (*Id.*)

Plaintiff visited Virginia Daley, a nurse practitioner, at the office of psychiatrist Ehab Sargious, M.D., in October 2012.  (Tr. 525.)  Plaintiff reported that he had bipolar disorder and was having problems with mood swings, depression, and anger.  (*Id.*)  He told Ms. Daley that he struggled with passive suicidal thoughts, but denied any past or current suicide attempts.  (*Id.*)  Plaintiff was prescribed Celexa and Seroquel, and Ms. Daley instructed him to take them as prescribed and call the office if he ran out.  (Tr. 525-526.)  At a subsequent visit with Ms. Daley in November 2012, Plaintiff reported that he never started taking his medications.  (Tr. 528.)  Ms. Daley described Plaintiff as cooperative, pleasant and quiet, with no suicidal or homicidal ideation.  (Tr. 529.) During a visit later that month, Plaintiff told Ms. Daley that he was depressed but was

---

[2]     A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

4

sleeping better.  (Tr. 530.)  Plaintiff's mood was normal and his affect constricted; he

had normal psychomotor activity; and his thought process was logical and goal-

directed.  (Tr. 531.)  Ms. Daley did not observe any evidence of delusional thinking, but

Plaintiff said he was paranoid, experiencing some hallucinations, and feeling suicidal

and homicidal.  (Tr. 530-531.)  Ms. Daley referred Plaintiff to the emergency room at

Trumbull Memorial Hospital ("Trumbull") for further treatment. (Tr. 531.)

Records from Trumbull indicate that Plaintiff was "planning to kill his mother and

kill himself because of the mother bringing people that are using drugs to the house."

(Tr. 475.)  He also threatened to "shoot up people if [he] doesn't get SSI, then shoot

himself," and expressed frustration about "people giving him the run around about

paperwork for SSI."  (Tr. 493.)  Plaintiff tested positive for marijuana, but denied

ongoing drug abuse.  (Tr. 518.)  He was admitted to the hospital and placed on suicide

observation and assault prevention.  (Tr. 502.)  During an evaluation with Dr. Sargious

prior to discharge, Plaintiff reported severe symptoms and signs of depression, having

no energy or motivation, feeling extremely overwhelmed, having difficulty focusing and

concentrating, having difficulty sleeping, irritability, edginess, and anger episodes.  (Tr.

475.)  Upon evaluation by Dr. Sargious, Plaintiff had no psychomotor retardation, he

was cooperative, and his speech was normal in rate and volume.  (Tr. 476.)  His mood

was depressed but his affect was appropriate, stable, and full, which Dr. Sargious noted

was "[n]ot congruent with his reported mood."  (*Id.*)  Plaintiff denied having auditory or

visual hallucinations.  (*Id.*)  He was prescribed Celexa and advised to stop taking

Seroquel and Paxil.  (*Id.*)  Dr. Sargious recommended continued inpatient psychiatric

treatment, which Plaintiff refused because he wanted to leave the hospital to visit with

5

his 13-year-old daughter.  (*Id.*)

Plaintiff continued to treat with Dr. Sargious after his discharge from the hospital. (Tr. 532-537, 543-544.)  At a December 2012 visit, Dr. Sargious noted that Plaintiff was still reporting depression and anxiety.  (Tr. 543.)  However, his thought process was logical and goal directed; his behavior was cooperative; he was not having delusions or auditory or visual hallucinations; and his insight, judgment, and impulse control were adequate.  (*Id.*)

In March 2013, Plaintiff saw nurse practitioner Brenda Ritz at Valley Counseling Service.  (Tr. 546-549.)  Plaintiff reported that he was having difficulty sleeping and controlling his anger, and that he had been involved in "[v]iolent yelling and fighting with cousins."  (Tr. 547.)  He also reported having auditory and visual hallucinations and suicidal thoughts, but denied suicidal intent or plans.  (*Id.*) Ms. Ritz advised Plaintiff to stop taking Celexa and start taking Seroquel XR and Trazodone, and to return for a follow-up appointment in one month.  (*Id.*)  There is no evidence in the record that Plaintiff returned for treatment after March 2013.

**2.  Agency Reports**

In November 2011, state agency psychologist Roseann Umana, Ph.D., opined that Plaintiff did not have a severe mental impairment.  (Tr. 73-74, 81-83.)  Dr. Umana found Plaintiff to be only partially credible and determined that the medical evidence did not support the limitations Plaintiff reported.  (Tr. 74, 82.)  In May 2012, Karen Steiger, Ph.D., agreed with Dr. Umana's determination that Plaintiff did not have a severe mental impairment and that the medical evidence did not support Plaintiff's reported

6

limitations.  (Tr. 93, 103.)  Dr. Steiger opined that Plaintiff had mild restrictions in activities of daily living and in maintaining social functioning, but that he had no difficulties in maintaining concentration, persistence, or pace.  (Tr. 93, 103.)

On April 30, 2012, consultative examiner J. Joseph Konieczny, Ph.D., performed a psychological evaluation of Plaintiff.  (Tr. 470-474.)  Plaintiff reported that he was taking Paxil as prescribed and attending counseling at Valley.  (Tr. 471.)  Dr. Konieczny noted that Plaintiff was appropriately groomed and dressed, pleasant, and cooperative.  (*Id.*)  Plaintiff reported having mood swings and difficulty controlling his temper.  (*Id.*)  He also reported feelings of depression and difficulty sleeping.  (Tr. 471-472.)  Dr. Konieczny noted that Plaintiff showed no indications of nervousness, anxiety, or grandiose thinking.  (Tr. 472.)  He further noted that Plaintiff's "general thought content, although reflective of his subdued presentation, depression, and PTSD symptoms, did not otherwise appear to be unusual."  (*Id.*)  Dr. Konieczny noted that Plaintiff's ability to concentrate and attend to tasks showed no indications of impairment; he showed no deficits in his awareness of rules of social judgment and conformity; and he showed mild deficits in his overall level of judgment.  (*Id.*)  Based on his assessment, Dr. Konieczny diagnosed PTSD and chronic depressive disorder and assigned a GAF score of 46, indicating serious symptoms.  (Tr. 473.)  Dr. Konieczny opined that Plaintiff had no limitations in his ability to understand, remember, and carry out instructions, but that he would have some difficulty in maintaining focus and persistence in moderate to complex multi-step tasks.  (*Id.*)  He further opined that Plaintiff would have diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to typical supervision and interpersonal situations in the work setting.  (*Id.*)  Dr.

7

Konieczny concluded that Plaintiff participates somewhat in routine daily household responsibilities and would appear to require a slight degree of supervision and monitoring in the management of his daily activities and in handling his financial affairs. (*Id.*)

In July 2013, Plaintiff saw Kenneth Gruenfeld, Psy.D., for a consultative examination. (Tr. 551-558.) Based on his evaluation of Plaintiff, Dr. Gruenfeld concluded that Plaintiff had major depressive disorder (moderate), PTSD, and borderline intellectual functioning, and assigned a GAF score of 65, indicating mild symptoms. (Tr. 557.) Dr. Gruenfeld opined that Plaintiff could have difficulty in understanding, remembering, and carrying out instructions, as cognitive testing revealed borderline intellectual functioning suggesting that Plaintiff would struggle to comprehend job tasks above his intellectual abilities. (Tr. 556.) Dr. Gruenfeld also opined that Plaintiff "may have some problems" with maintaining attention, concentration, persistence, and pace; that stress would likely impact panic attacks, concentration, and motivation in the future; and that Plaintiff may struggle to work with others if they trigger memories of being shot. (*Id.*)

**C.    Hearing Testimony**

    **1.    Plaintiff's Hearing Testimony**

Plaintiff was shot during a robbery on August 4, 2011. (Tr. 43.) He had ongoing pain in his nasal passage due to the gunshot wound. (*Id.*) Plaintiff was also shot in the thigh but testified that he was able to walk and move pretty well. (Tr. 44.) Plaintiff experienced flashbacks from the incident every night and at least twice per day. (Tr.

45.)  The flashbacks caused paranoia.  (*Id*.)   Plaintiff also had trouble sleeping and experienced panic attacks.  (Tr. 46-47.) He had a lot of anger and difficulty controlling his temper since he was shot.  (Tr. 49.)

Plaintiff was able to care for his personal grooming on his own.  (Tr. 52.)  On most days, he would stay at home and watch TV, listen to music, or read books.  (*Id.*) He helped his mother with household chores such as laundry and washing dishes.  (Tr. 53.)  He sometimes went grocery shopping with his mother and occasionally talked to friends on the phone.  (Tr. 52-53.)

### 2.        Vocational Expert Testimony

Kevin Yee, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience who could perform a full range of work at all exertional levels.  (Tr. 62.)  The individual would be limited to simple, routine tasks in a static environment that experienced few, if any, changes.  (*Id.*)  There would be no strict time or fast-pace production quotas, and the individual would not be responsible for the health or safety of others.  (*Id.*)  The individual could have incidental to no contact or interaction with the general public and could have occasional superficial contact with coworkers and supervisors, meaning that they could work in the same general area but not engage in any type of arbitration, conflict resolution, negotiation, direction, management, or group tasks.  (Tr. 62.)  The VE testified that the hypothetical individual would be capable of performing jobs such as a laundry worker, hand packager, and housekeeping cleaner. (*Id.*)

9

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his

10

past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.

2. The claimant has not engaged in substantial gainful activity since August 4, 2011, the alleged disability onset date.

3. The claimant has the following severe impairments: post-traumatic stress disorder, major depressive disorder, psychotic disorder, anxiety; borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: he can perform simple routine tasks in a static environment that would experience few if any changes.  There are no strict time or fast pace production quotas.  He cannot be responsible for the health or safety of others.  He can have incidental to no contact or interaction with the general public.  He can have occasional superficial contact with coworkers and supervisors meaning that the claimant can be in the same general area, but should not engage in any type of arbitration, conflict resolution, negotiation, direction, management, or group tasks.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born in August 1982 and was 28 years old, which

is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 4, 2011, through the date of this decision.

(Tr. 16-26.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

12

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

## B.    Plaintiff's Assignment of Error

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence, because the ALJ failed to account for all of the medical limitations assessed by state agency consultants Drs. Konienczny and Gruenfeld.  According to Plaintiff, the ALJ erred by failing to assign significant or great weight to the doctors' opinions.  For the following reasons, Plaintiff's argument lacks merit.

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for her decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that

13

evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Here, the ALJ discussed the opinions of Drs. Konienczy and Gruenfeld in great detail, assigning "little weight" to Dr. Konienczy's opinion and "some weight" to Dr. Gruenfeld's opinion.  (Tr. 21-24.)  A review of the ALJ's decision indicates that the ALJ adequately explained why he chose to give only some weight to their opinions, noting that both opinions were inconsistent with Plaintiff's psychological assessments. (*Id.*)

- **Dr. Konienczy:** Dr. Konienczy performed a psychological evaluation of Plaintiff in April 2012.  (Tr. 470-474.)  He concluded that Plaintiff had no limitations in his ability to understand, remember, and carry out instructions, but that he would have some difficulty in maintaining focus and persistence in moderate to complex multi-step tasks.  (Tr. 473.)  He further opined that Plaintiff would have diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to typical supervision and interpersonal situations in the work setting.  (*Id.*)  The ALJ found  Dr. Konienczy's  opinion  inconsistent  with  Dr. Konienczy's assessment and Plaintiff's treatment records from the previous month. (Tr. 22.) As the ALJ explained, during the cognitive functioning tests, Plaintiff could concentrate and attend to tasks without any indications of impairment; he was able to perform a serial three subtraction task; he could recall three of three objects after a period of five minutes; he showed no deficits in his general funds of knowledge; he could perform logical abstract reasoning; he did not show deficits in his social judgment or conformity; and he showed only mild deficits in his overall judgment.  (Tr. 21, 472.)  The ALJ further noted that in contrast to Plaintiff's testimony, there was no evidence of paranoid or grandiose thinking.  (Tr. 21.)  Furthermore, Plaintiff's thought content was normal; he could care for his personal hygiene, prepare simple meals, and perform some

14

household activities such as laundry and cleaning; and there was no evidence of suicidal, homicidal, or psychotic symptoms at the time of Dr. Konienczy's evaluation. (Tr. 21-22.) Accordingly, the ALJ determined that Dr. Konienczy's opinion was entitled to little weight. (Tr. 22.)

- **Dr. Gruenfeld:** Plaintiff saw Dr. Gruenfeld for a consultative evaluation in July 2013. (Tr. 551-558.) Dr. Gruenfeld opined that Plaintiff could have difficulty in understanding, remembering, and carrying out instructions. (Tr. 556.) Dr. Gruenfeld also opined that Plaintiff "may have some problems" with maintaining attention, concentration, persistence, and pace; that stress would likely impact panic attacks, concentration, and motivation in the future; and that Plaintiff may struggle to work with others if they trigger memories of being shot. (*Id.*) After discussing Dr. Gruenfeld's opinion in detail, the ALJ explained that he gave "some weight to the opinion . . . since it was not consistent with the assessment as described above." (Tr. 24.) As the ALJ noted, Dr. Gruenfeld wrote that during the assessment, Plaintiff "exhibited good concentration as evidenced by his ability to maintain good eye contact, answer examiner questions, and consistently remain on topic." (Tr. 24, 555.) During Dr. Gruenfeld's assessment, Plaintiff did not exhibit any hostile or aggressive behavior; did not express suicidal or homicidal ideation; and did not exhibit or endorse symptoms of a psychotic condition, including loosening of association, ideas of reference, auditory or visual hallucinations or paranoid thoughts or delusional thinking. (*Id.*) Plaintiff's cognitive testing suggested that he could perform simple, repetitive tasks but may have difficulty interacting with others and managing stress. (*Id.*) In addition to discussing the inconsistency of Dr. Gruenfeld's opinion with Dr. Gruenfeld's assessment notes, the ALJ explained that he gave less than significant weight to the opinion because it was based in large part on Plaintiff's subjective allegations, which the ALJ found incredible. (Tr. 24.) For example, the ALJ explained that Plaintiff told Dr. Gruenfeld that he did not leave his house due to paranoia, but testified that he went to a bar with a friend, took his daughter to the movies, and sometimes went to the store and to the bank. (Tr. 24.)

The ALJ's assessment of Drs. Konienczy and Gruenfeld's opinions is

sufficiently clear to allow meaningful judicial review. As the Commissioner notes, the

15

aforementioned professionals were consultative examiners, not treating physicians.[3]  As a result, the ALJ was not required to evaluate their opinions with the same standard of deference he would have applied to an opinion rendered by a treating physician.  Because Drs. Konienczy and Gruenfeld were consultative examiners, the ALJ was required only to acknowledge that their opinions contradicted his RFC finding, and explain why he did not include their limitations in his determination of Plaintiff's RFC.  A review of the ALJ's decision indicates that the ALJ adequately explained why he chose to give only "little" or "some" weight to their opinions.  (Tr. 21-24.)

Moreover, Plaintiff has not explained how the ALJ's failure to give significant weight to the opinions of Drs. Konienczy and Gruenfeld affects the outcome of his case.  As the Commissioner notes, the ALJ's RFC determination reasonably accounts for the limitations set forth in the opinions of Drs. Konienczy and Gruenfeld by limiting Plaintiff to simple routine tasks in a static environment that would experience few, if any,

---

[3]     A treating source is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1502.  Generally, an ongoing treatment relationship exists when the patient sees or has seen the treating source with a frequency consistent with accepted medical practice for the type of evaluation required for the medical condition at issue.  *Id.*  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).

changes; no strict time or fast-pace production quotas; no responsibility for the health or safety of others; no work involving any type of arbitration, conflict resolution, negotiation, direction, management, or group tasks; and limited contact with coworkers, supervisors, and the general public.  (Tr. 19.)  Plaintiff has not identified any further restrictions that would be required based on the opinions of Drs. Konienczy and Gruenfeld.  Accordingly, Plaintiff's assignment of error does not present a basis for remand.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: October 31, 2014

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

17